UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JANET L. SCHMIDT, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 04-892 (RMC) |
| ELAINE L. CHAO, Secretary of Labor, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION**

Janet L. Schmidt, a Caucasian, charges Elaine L. Chao, in her official capacity as Secretary of Labor, with reverse discrimination and retaliation after an Asian female and an Hispanic male were promoted instead of Ms. Schmidt. After full discovery, the Secretary moves for summary judgment. Although the Court finds that Ms Schmidt carried her burden of establishing a prima facie case of reverse discrimination, she has failed to demonstrate pretext in the face of the Secretary's legitimate, nondiscriminatory reasons for the selections. Ms. Schmidt has also failed to establish a prima facie case of retaliation. Therefore, the Court will dismiss her complaint.

**I. BACKGROUND**

Ms. Schmidt works for the Department of Labor ("DOL"), Pension and Welfare Benefits Administration ("PWBA"), Office of Exemption Determinations ("OED"), Division of Individual Exemptions, as a GS-12 attorney. On July 17, 2000, OED posted a vacancy announcement for two GS-13 Pension Law Specialists. Three people applied: Ms. Schmidt, Jose Jara, an Hispanic male, and Karin Weng, an Asian female. All three applicants already worked for

OED and were on the "Best Qualified" list for the positions.

Ivan Strasfeld, a Caucasian male, is the Director of PWBA. He appointed Emmett Fillmore Williams, a Caucasian male, to be Acting Division Chief of OED in May 2000, a position Mr. Williams held at the time the selections were made for the GS-13 Pension Law Specialists positions. Mr. Williams was the selecting official and his involvement in the selection process began when he received the Best Qualified list.

Mr. Williams consulted with Jan Broady, an African-American female, on interview questions to ask the applicants, and Ms. Broady sat in on the interviews. All three candidates were interviewed. Mr. Jara and Ms. Weng were interviewed in person because they were working in Washington, D.C. However, Ms. Schmidt was on detail in California at the time of the interviews, so her interview was conducted by telephone. All three candidates had very good interviews, but Mr. Williams believed that Ms. Schmidt's interview was the best among them and he described it as "excellent." Each of the applicants was asked the same questions.

In addition to the interviews, Mr. Williams considered the candidates' most recent performance appraisals, statistics showing how many cases each applicant had closed with a granted exemption within the preceding 18-month period, and conversations he had regarding the candidates with the OED managers for whom each of them worked.[1]

In their most recent performance appraisals, Ms. Weng and Mr. Jara each received "Outstanding" performance ratings, the highest rating available. Ms. Schmidt received the second highest rating, "Highly Effective," in her most recent performance appraisal. Additionally, Ms.

---

[1] Since all candidates already worked for OED, these other managers were immediately available in the office.

Weng and Mr. Jara each closed more cases with the grant of an exemption in the preceding 18-month period than did Ms. Schmidt.[2] Finally, Mr. Williams identified four managers in the office with whom he discussed the three candidates' performances: Mr. Campagna, Ms. Hall, Ms. Selvaggio, and Mr. Lux.

In making his final selections for the GS-13 positions, Mr. Williams gave two-thirds weight to the combination of the performance appraisal and the case statistics, and one-third weight to the combination of the interview and the input from the candidates' managers.

Ms. Schmidt also claims that she engaged in protected activity, for which she was retaliated against in the form of failure to promote. She asserts that her protected activity consisted of (1) informing her supervisor that she would file a union grievance for minor changes to her performance evaluation that did not change her overall rating;[3] (2) a December 1998 request for

---

[2] Ms. Schmidt doubts that Mr. Williams reviewed case statistics, Pltf.'s Opp. at 4, but her doubt is based on a misreading of the record. Her counsel questioned Mr. Williams in his deposition concerning the case statistics he had reviewed, using a document that was created after the selections and that contained cases closed after the selections. Pltf.'s Opp. at 4. However, Mr. Williams testified that he looked at several lists, Def.'s Mot. Summ. Judgment, Ex. 3, Deposition of Emmett Williams ("Williams Dep.") at 49-50, and that the list proffered by counsel was a "fair representation" of the statistics on which he relied, not that it was the exact list. *Id.* at 50; *see also* Pltf.'s Opp. Ex. 6. Ms. Schmidt does not dispute that her Exhibit 6 reveals that she closed three cases with the grant of an exemption (1999-44, 1999-07, and 1999-01), while Mr. Jara closed 14 cases with the grant of an exemption (2000-08, 2000-31, 2000-17, 2000-7, 2000-18, 2000-01, 2000-35, 2000-02, 2000-16, 2000-14, 2000-19, 2000-24, 2000-44, and 2000-41), and Ms. Weng closed ten cases with the grant of an exemption (2000-25, 1999-04, 1999-37, 2000-42, 1999-24, 2000-26, 2000-15, 1999-26, 1999-27, 2000-09). Ms. Schmidt claims that four of the cases credited to Ms. Weng were transferred to her when Ms. Schmidt left for her detail in California and should be not so credited. Pltf.'s Opp. at 5. Ms. Weng received credit for closing one case that had been transferred to her from Ms. Schmidt, *i.e.*, 2000-15. Were this case removed from her list, Ms. Weng would have closed out nine cases, more than Ms. Schmidt's three closed cases. (Because Ms. Schmidt was on detail in California, she did not close out 2000-15 and would not have received credit for closing it in any event.)

[3] Ms. Schmidt never actually filed a union grievance. Schmidt Dep. at 58.

accommodation for a hearing impairment; (3) a May or June 1998 complaint about the use of inappropriate language in the office; and (4) early 2000 complaints to an Equal Employment Opportunity officer and the Office of the Inspector General about inappropriate comments and language in OED.  Pltf.'s Opp., Ex. 8, Deposition of Janet L. Schmidt ("Schmidt Dep.") at 145-46.

## II.  LEGAL STANDARDS

### A.  Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under federal statutes.  28 U.S.C. § 1331.  Here, Ms. Schmidt brought suit pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.  As this case presents a question of federal law, this Court has original jurisdiction.

### B.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

Under the *McDonnell Douglas* burden-shifting scheme, Ms. Schmidt has the initial burden of establishing a prima facie case of reverse discrimination or retaliation. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts to the Secretary to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the Secretary meets this burden, then Ms. Schmidt must have the opportunity to prove, by a preponderance of the evidence, that "the legitimate reasons offered by the [Secretary] were not its true reasons, but were a pretext for discrimination." *Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (citing *McDonnell Douglas*, 411 U.S. at 804).

The Secretary argues that Ms. Schmidt has not established a prima facie case of reverse discrimination or retaliation and that, even if a prima facie case were made out, Ms. Schmidt has not shown evidence of pretext in the face of the Secretary's legitimate, non-discriminatory reasons for the selections of Ms. Weng and Mr. Jara. These will be addressed in turn.

### A. Prima Facie Case

To establish a prima facie case of discrimination, a plaintiff normally must show (1) that she is a member of a protected class; (2) that she suffered an adverse personnel action; (3) under circumstances giving rise to an inference of discrimination. *See Stella v. Mineta*, 284 F.3d 135, 144-45 (D.C. Cir. 2002) (citing *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). Because she is Caucasian, Ms. Schmidt advances a reverse discrimination claim and "has the burden at the prima facie stage not of showing that she belongs to a protected class, but of demonstrating additional 'background circumstances that support the suspicion that the defendant is the unusual employer that discriminates against the majority.'" *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 5 n.5 (D.D.C. 2000) (quoting *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993)).

The circumstances to which Ms. Schmidt points to satisfy her burden are (1) comments from two managers in different parts of the agency and (2) the fact of the existence of DOL's affirmative action policy. Ms. Schmidt reports that she was told by a manager in the Office of Enforcement that he was told to hire an Hispanic male for his office. Schmidt Dep. at 124. She also states that her supervisor in California told her that the agency wanted to hire more Asians throughout the country because the majority of the Asian staff at DOL was concentrated in California. *Id.* at 127-28.

Additionally, Ms. Schmidt claims that she "does not rely solely on two conversations she had with personnel[4] regarding hiring and promotions. To the contrary, [PWBA] . . . has an

---

[4] The use of the word "personnel" in this sentence is indicative of Ms. Schmidt's subtle exaggerations of the record. She talked to one line manager and to one line supervisor, neither of whom was in a "personnel," or human resources, position but each of whom does constitute "personnel" at DOL.

affirmative action policy that emphasizes a diverse workforce and the need to make improvements in recruitment and promotions of minorities, including Hispanics and Asians." Pltf.'s Opp. at 2. Ms. Schmidt asserts that "[t]his mandate was so critical that a performance element to capture compliance was included in the evaluation of managers, including [Mr.] Strasfeld and [Mr.] Williams, beginning in FY 1999." *Id.* Citing Mr. Strasfeld's testimony, Ms. Schmidt asserts that Ms. Weng and Mr. Jara were pre-selected because of the affirmative action policy. Mr. Strasfeld testified:

> Q. At the time those two positions were announced, was it your intent to promote two people?
> A. Yes.
> Q. You had two people in mind?
> A. I had two people who I thought were qualified.
> Q. Who were the people you thought were qualified?
> A. Jose Jara and Karin Weng.
> Q. So at the time you announced these two positions, you knew these two people were qualified?
> A. I believed they were, although I did not directly supervise them.
> Q. And did you share your opinion with Mr. Williams?
> A. No.
> . . .
> Q. Back in 2003, was there a push within the Department of Labor to focus recruitment on Hispanics and/or Asians?
> A. There was a suggestion [at a staff meeting] to be more inclusive and to reach out to groups that were not adequately represented at the department.

Pltf.'s Opp., Ex. 1, Deposition of Ivan Strasfeld ("Strasfeld Dep.") at 19, 20-21. Mr. Strasfeld also testified that he had no role in the actual selections for the GS-13 positions. *Id.* at 25.

Although Mr. Williams, the selecting official, testified that he did not review or consider the affirmative action policy at the time of the selections, Ms. Schmidt disbelieves this testimony because she

> had attended a managers' meeting to help out and was present during the portion of the managers' meeting where they discussed what I believe [are] called schedules and timetables, telling managers that they needed to hire and promote Hispanics and there was a shortage of Asians in the national office, and it was somewhat compensated for by the Asian populations in the field offices in California.

Schmidt Dep. at 124.  She recalls that Mr. Williams attended the same meeting.  *Id.*

However, Ms. Schmidt overstates the law when she asserts that "the existence of an affirmative action plan may be one factor suggesting discrimination against the majority."  Pltf.'s Opp. at 2.  Ms. Schmidt cites *Bishopp v. District of Columbia*, 788 F.2d 781 (D.C. Cir. 1986) to support her assertion, but this case does not stand for the proposition that the existence of an affirmative action policy automatically implies discrimination against the majority.  Rather, there must be a causal connection between the two, demonstrated by direct or circumstantial evidence.  In *Bishopp*, the connection between the existence of an affirmative action plan and reverse discrimination was made when the D.C. Fire Department promoted an African-American candidate, with obviously-inferior credentials, over four (4) Caucasian candidates who were better qualified.  788 F.2d at 786.  Here, Ms. Schmidt attempts to create the necessary connection by describing the affirmative action policy as a "mandate to promote Hispanics and Asians," Pltf.'s Opp. at 2, but that description overstates the policy and the facts.

An affirmative action policy is process-oriented, not result-oriented.  It is designed to overcome the inadvertent or hidden biases that omit women and minorities from competition before the race even starts, not to declare them the fastest runners.  The thesis of affirmative action is that with greater diversity of qualified candidates, there will be greater diversity in hires and promotions.  But the focus of affirmative action is to ensure that a wide net is cast to obtain diversity

among qualified candidates, not to dictate the actual selection. "Quotas" and "mandates" are not part of this scheme – and are usually illegal unless they are imposed to correct adjudicated past discrimination.

The Secretary argues that Ms. Schmidt's claim that the DOL affirmative action policy affected the selections here is based on speculation and guesswork, which "fail[] to provide any objective basis for an inference of discrimination, thus defeating her prima facie case." *Powell v. Washington Metro. Area Transit Auth.*, 238 F. Supp. 2d 160, 165 (D.D.C. 2002).  Indeed, both Mr. Williams and Ms. Schmidt are Caucasian, which weighs against an inference of discrimination. *See Walker v. Dalton*, 94 F. Supp. 2d 8, 16 (D.D.C. 2000) (finding no inference of discrimination where one of three panel members who ranked the applicants was of the same protected class as plaintiff); *see also Horvath v. Thompson*, 329 F. Supp. 2d 1, 5 (D.D.C. 2004) (noting that it is harder to establish gender discrimination when the selecting official is the same gender as the plaintiff). Mr. Williams clearly stated that the affirmative action policy played no role in his selections. Def.'s Mot. Summ. Judgment, Ex. 12, Declaration of Emmett Williams ("Williams Decl.") at 3 ("I did not consider any affirmative action policy prior to selecting Mr. Jara and Ms. Weng, nor did any such policy play a role in my consideration of the candidates.").

Ms. Schmidt's prima facie case builds inference upon inference and is accordingly extremely weak.[5] It is not fatally weak, however. For purposes of ruling on summary judgment, the

---

[5] The Court does not rely upon the Workforce Profile attached as Exhibit 9 to Ms. Schmidt's opposition to the Secretary's motion for summary judgment. Ms. Schmidt "has failed to show how the proffered statistics support an inference of discrimination." *Horvath*, 329 F. Supp. 2d at 10; *see also Thomas v. Chao*, 2003 WL 21186036, at *3 (D.C. Cir. 2003) (unpublished) (finding that the district court "was correct to exclude from evidence the list of employees identified by race and sex . . . in the absence of an expert who could testify that the alleged underrepresentation was statistically significant"). "Generally, in determining whether an employee has been the subject of

Court gives all favorable inferences to Ms. Schmidt and finds that she has presented a prima facie case of reverse discrimination.

### B. Legitimate, Nondiscriminatory Reason and Pretext

The record shows that Ms. Weng and Mr. Jara had better performance appraisal ratings, had completed more exemption determinations in the preceding 18 months, and were more highly recommended by their managers than Ms. Schmidt. However, Ms. Schmidt out-performed the other candidates during the interviews. Relying on these facts, Mr. Williams stated:

> The performance appraisal [Ms. Schmidt] had for the most recent period was highly effective and it would have been difficult to have selected her when . . . the other candidates had an outstanding [rating]. Also, when I looked at the work statistics, while she had closed a number of cases, she hadn't closed very many with a final exemption, a granted exemption, which supported some of the things that the other supervisors had said about the fact that she didn't seem to be doing her work. She wasn't always at her desk and she was less interested, less focused at times on what we were doing. . . . I didn't have the data to support [a promotion for Ms. Schmidt] on an objective basis. If you have superior numbers and ratings, then you can't support it on an objective basis.

Williams Dep. at 67, 72. The Secretary stated a legitimate, nondiscriminatory reason for the selection of Mr. Jara and Ms. Weng for the GS-13 positions.

Now the burden shifts to Ms. Schmidt to show that the Secretary's reasons were pretextual. Under Title VII law, "[i]t is not enough for [Ms. Schmidt] to show that a reason given for a job action is not just, or fair, or sensible. [She] must show that the explanation given is a phony reason." *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994) (citation omitted). At the summary judgment stage, if Ms. Schmidt "is unable to adduce evidence that could allow a

---

discrimination, 'the courts have consistently emphasized that the ultimate issue is the reasons for *the individual plaintiff's* treatment, not the relative treatment of different *groups* within the workplace.'" *Horvath*, 329 F. Supp. 2d at 10 (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).

reasonable trier of fact to conclude that [the Secretary's] proffered reason was a pretext for discrimination, summary judgment must be entered against [her]." *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir. 1997).

According to Ms. Schmidt, pretext can be shown by reference to other factors that Mr. Williams should not have considered or should have considered. Pltf.'s Opp. at 7. She alleges that Mr. Williams "impermissibly" used the fact that she did not sign the performance appraisal, which rated her performance as "Highly Effective," against her because Mr. Williams noted this fact on his interview sheet. Mr. Williams rated Ms. Schmidt's interview "excellent" and the best of the three candidates; he denies that he considered her failure to sign the performance appraisal as part of the selection process. Ms. Schmidt does not create a genuine dispute of material fact with this argument. Even if, contrary to his testimony, Mr. Williams had considered the fact that Ms. Schmidt failed or refused to sign her performance appraisal, such consideration would not support a reverse discrimination claim.

Ms. Schmidt further challenges Mr. Williams's reliance on performance evaluations,[6] case statistics, interviews, and conversations with supervisors to make his selection. She asserts that he ignored evaluation factors designated on the vacancy announcement, such as "demonstrated ability to analyze complex legal and factual issues, as well as knowledge of the provisions of ERISA and experience in its application." Pltf's. Opp. at 3. However, this argument merely asks the Court to be a "super-personnel department" to "reexamine[] an entity's business decisions." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986); *see also Texas Dep't Cmty. Affairs v.*

---

[6] Ms. Schmidt concedes that Mr. Jara and Ms. Weng "had higher overall scores on their performance evaluations." Pltf.'s Opp. at 6.

*Burdine*, 450 U.S. 248, 259 (1981) ("[T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that the court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability."). Whether a combination of performance evaluations and completed exemptions demonstrates an ability to analyze complex legal and factual issues and knowledge of ERISA, is a point to be determined by the employer, not the courts, but its logic is compelling.

Suggesting that Mr. Williams fabricated an objective basis for the selections, Ms. Schmidt attacks his supposed reliance on the case statistics document her counsel showed to Mr. Williams during the latter's deposition. Pltf.'s Opp. at 4. The document was dated after the selection of Mr. Jara and Ms. Weng for the GS-13 positions. There are at least two problems with this argument: first, Mr. Williams did not rely on the exact document proffered by Ms. Schmidt's counsel, so its date is irrelevant, and second, Ms. Schmidt does not challenge the actual data that indicate that she completed fewer exemptions than either Mr. Jara or Ms. Weng. "Assuming *arguendo*, that Mr. Williams utilized case statistics," Pltf.'s Opp. at 5, Ms. Schmidt argues that her total production was greater than either Ms. Weng's or Mr. Jara's. As Ms. Schmidt herself acknowledges, the "small numerical differences" are minor, Pltf.'s Opp. at 5, and the Court will not question Mr. Williams' selections among applicants who were equally qualified. *See Burdine*, 450 U.S. at 259.

Finally, Ms. Schmidt does not contest that OED supervisors Mr. Campagna, Ms. Hall, and Ms. Selvaggio provided input to Mr. Williams and that they opined that Ms. Weng and Mr. Jara were more qualified than Ms. Schmidt. In light of this concession, Ms. Schmidt's reliance on Mr.

Lux's failure to recall a conversation with Mr. Williams regarding Mr. Jara's work performance, Pltf.'s Opp. at 7, does not raise a genuine dispute over a material fact. Ms. Schmidt has failed to show that the Secretary's legitimate, nondiscriminatory reasons for selecting Mr. Jara and Ms. Weng were pretextual.

### C. Retaliation

A plaintiff establishes a prima facie case of retaliation by showing that (1) she engaged in activity protected by Title VII; (2) she suffered an adverse personnel action; and (3) that a causal connection linked the two. *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. Jan. 10, 2006); *see also Broderick v. Donaldson,* 437 F.3d 1226, 1231-32 (D.C. Cir. Feb. 10, 2006). A causal connection may exist if the employer had knowledge of the protected activity and the adverse personnel action took place shortly after the employee engaged in the protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). Title VII prohibits an employer from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this title, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a). If a plaintiff establishes a prima facie case of retaliation, then the *McDonnell Douglas* burden-shifting framework applies. *Broderick,* 437 F.3d at 1231-32.

Filing a formal complaint with the Equal Employment Opportunity Commission qualifies as protected activity under Title VII, *Forkkio v. Powell*, 306 F.3d 1127, 1131-32 (D.C. Cir. 2002), but Ms. Schmidt was not required by law to file a formal complaint, *Tsehaye v. William C. Smith & Co.*, 402 F. Supp. 2d 185, 197 (D.D.C. 2005). However, "[n]ot every complaint garners its author protection under Title VII. . . . While no 'magic words' are required, the complaint must in

some way allege unlawful discrimination, not just frustrated ambition." *Broderick*, 437 F.3d at 1232.

The Court finds that Ms. Schmidt has failed to establish a prima facie case of retaliation. She has not sufficiently shown that she engaged in activity protected by Title VII or that there was a causal connection between her alleged protected activity and the selection process for the GS-13 positions. Her informal complaints about inappropriate comments in the workplace do not suffice as her opposition to an unlawful employment practice, as required by Title VII.[7] Additionally, her threat to file a union grievance and her request for an accommodation for her hearing disability do not fall under the auspices of activity protected by Title VII.

### IV.  CONCLUSION

For the reasons stated, the Court finds that Ms. Schmidt has failed to demonstrate that the Secretary's legitimate, nondiscriminatory reasons for the selections at issue were pretext for reverse discrimination. Ms. Schmidt has also failed to establish a prima facie case of retaliation. The Secretary's motion for summary judgment will be granted and this case will be dismissed. A memorializing order accompanies this memorandum opinion.


Date: June 13, 2006                                /s/
                                                  ROSEMARY M. COLLYER
                                                  United States District Judge

---

[7] Even if the early 2000 complaint constituted protected activity, the Secretary has legitimate, nondiscriminatory reasons for selecting Mr. Jara and Ms. Weng for the GS-13 positions, and Ms. Schmidt cannot show that these reasons are pretextual. Therefore, her retaliation claim fails.